**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **EDUARDO ROJAS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Civil Action No. _____** |
| | § | |
| **ELBIT SYSTEMS OF AMERICA, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

---

**PLAINTIFF EDUARDO ROJAS' ORIGINAL COMPLAINT**

---

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE**:

NOW COMES Eduardo Rojas and files this Original Complaint against Elbit Systems of America, LLC (hereinafter, "Defendant" or "Elbit Systems"), asserting causes of action pursuant to the Defense Contractor Whistleblower Protection Act 10 U.S.C. § 2409 and the False Claims Act 31 U.S.C. § 3730(h), and in support of which would respectfully show the honorable Court and Jury as follows:

**I.
PARTIES**

1.     Plaintiff Eduardo Rojas is an individual residing in the State of Texas and may be served at his home at 8322 Denali Drive, Fort Worth, Texas 76137.

2.     Defendant Elbit Systems of America, LLC is a corporation doing business in the State of Texas at 4700 Marine Creek Parkway, Fort Worth, Texas 76179, and may be served through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## II.
### JURISDICTION AND VENUE

3.      This Court has jurisdiction to hear the merits of this case pursuant to 28 U.S.C. § 1331. Venue is proper in the Northern District of Texas, Fort Worth Division, pursuant to 28 U.S.C. § 1391, as Defendant maintains a principal place of business in Tarrant County, Fort Worth Division, Texas.

## III.
### FACTUAL BACKGROUND

#### A.  ELBIT SYSTEMS AND ITS SUBSIDIARIES

4.      Defendant Elbit Systems is a wholly owned subsidiary of Israeli defense contractor Elbit Systems, Ltd., with two of its main operation centers located in Fort Worth and San Antonio, Texas. Elbit Systems acts as a contractor for U.S. Foreign Military Financing and Foreign Military Sales programs.

5.      M7 Aerospace, LP, (hereinafter, "M7") is a wholly owned subsidiary of Elbit Systems, and its headquarters are located in San Antonio, Texas. M7 is an aerospace company with several distinct business units, including aircraft parts and product support, government logistics support, aerostructures manufacturing, aircraft maintenance, repair and operations, and aerial orthorectified imaging.

6.      EFW, Inc. (hereinafter, "EFW") is also a wholly owned subsidiary of Elbit Systems with its principal address at 4700 Marine Creek Parkway, Fort Worth, Texas 76179, which is the same address as Elbit Systems. EFW, like Elbit Systems and M7, is a vendor and contractor for the United States Department of Defense ("DOD"). Principally, EFW designs, develops, manufactures, and supplies military electronics to the DOD and international defense contractors and governments.

### B.   PLAINTIFF EDUARDO ROJAS

7.      Eduardo "Ed" Rojas grew up in Imperial Beach, California, the son of immigrants who fought through the labyrinthine United States immigration system to provide a more equitable and prosperous life for their children than the one they knew in Mexico. After settling in Imperial Beach from Tijuana, Ed's father struggled to save money and put himself through university, eventually becoming a naturalized citizen and an engineer for the United States government. Ed's mother, who at eight years old was spirited away to California following the murder of her father in their hometown of Melaque, Jalisco, stayed home to expertly care for the house and children. Her traditional Mexican food dinners were legendary, but it was her Albondigas soup that transported Ed from the Rojas' humble station in life to a culinary richness that, in his mind, not a single one of the fancy restaurants in the star-drenched hills of Southern California could touch.

8.      Inspired by his father and gifted in all things technical, Ed attended San Diego State University, earning a Bachelor of Science in Electrical Engineering in December 1997. Although his graduation was a significant personal achievement as a first-generation American and the son of immigrants, Ed's finest accomplishment, in his eyes, was convincing a beautiful fellow student to become his wife in 1999. Together, Sarah and Ed have two wonderful children, including an autistic son with whom they worked tirelessly to help better understand and function in a world they knew he would one day have to navigate alone.

### C.   ELBIT SYSTEMS AND THE DEPARTMENT OF DEFENSE PROJECT

9.      In January 2008, Ed accepted a position with Elbit Systems of America as a Systems Engineer. Through immensely hard work and dedication, including over 54 work trips in just four years to support helicopter programs for the United States Marine Corps, Ed worked his

way up to being a Senior Systems Engineer with Elbit. As a part of this job, Ed was charged with conducting and leading several meetings for DOD programs at customer sites, and technical interchange meetings with Subject Matter Experts. His duties included providing testing plans and leading system integration and test activities on-location at customer sites. Ed also installed and directed installations of equipment sold by Elbit for the AH-1W helicopter, with which he is extensively knowledgeable. Furthermore, Ed conducted cockpit mapping, which is required when installing and using the Helmet Display Tracking System that Elbit sold to the United States Marines.

10.     During the first quarter of 2014, the United States DOD granted Elbit Systems and M7 a contract for certain aircraft and helicopter installations (hereinafter, the "DOD project"), which was supplemented many times thereafter with related contracts. In order to provide sufficient and skilled staff for the DOD project, Elbit Systems and M7 contracted with a professional staffing company to provide technically skilled workers at the DOD project sites in California, Hawaii and North Carolina.

11.     One of the individuals with whom Ed worked was Joseph Trevino, an M7 team lead/ supervisor for the DOD project site in Hawaii. On September 16, 2014, Ed reviewed an email from Trevino, informing Ed of safety and regulatory concerns that Trevino had with the Hawaii project site and the fact that his superiors were ignoring such concerns.

12.     On September 26, 2014, alarmed by the issues that Ed discovered with DOD project sites in Hawaii and North Carolina, Ed emailed two in-house counsel for Elbit Systems regarding his concerns with DOD safety regulation compliance and issues related to losing more than half of the DOD project crew in Hawaii.

13.     On or about September 29, 2014, Mr. Rojas had a meeting with Chris Puffer, counsel for Elbit Systems, to discuss his concerns regarding compliance with safety regulations on the DOD project and the recent terminations of individuals at the site in Hawaii. The same day, Ed emailed Robert Bowden, the new team leader for the Hawaii site, a high-level list of issues that needed to be addressed at the site in order to ensure that safety regulations were being followed. However, because Ed had been assigned to the DOD project installations from the very beginning of the program and noting the seriousness of the matter, Ed requested that he be sent on-location to address these issues personally.

14.     On October 9, 2014, following the loss of another team member at the Hawaii site, Ed contacted the U.S. government program manager and Elbit Systems' in-house counsel to address his concerns with overall regulatory compliance and the loss of qualified personnel at the Hawaii site. The potential for loss of life had escalated with this firing, and steps needed to be urgently taken to mitigate this risk to zero. Ed also requested that he be sent on-location to the DOD project site in Hawaii because he had substantial experience and could help to get the installations back into compliance. However, Ed's request was denied, and the U.S. government program manager instructed him to contact the DOD Inspector General to address the matter any further.

**D.   REPORT, INVESTIGATION, AND REVOCATION OF DEPARTMENT OF DEFENSE CONTRACT**

15.     As such, on October 9, 2014, Messrs. Trevino and Rojas contacted the Judge Advocate General's Corps ("JAG") and the Department of Defense, Officer of the Inspector General regarding their concerns with safety regulation compliance on the DOD project and personnel issues at the Hawaii site.

16.     Shortly thereafter, an investigation was opened into Trevino and Ed's concerns, during which Ed provided a substantial amount of information to assist in the investigation. Chief among Ed's concerns, as he relayed to the investigators, was that Elbit Systems was committing waste, fraud and/or abuse by attempting to deliver aircraft from the Hawaii site at an expedited pace by cutting corners, including, *inter alia*, not performing Pitot-Static checks and isolation checks, which are critical to safety during installations.

17.     Specifically, Ed explained that Pitot-Static checks are performed to ensure that there are no leaks of air in the lines of the aircraft following installation of various components. The Pitot-Static line plays a substantial role in giving the pilot of the aircraft an accurate reading on the installed helmet-mounted display for airspeed and altitude, which has obvious and fatalistic implications. Furthermore, isolation checks are basic tests performed after installation to ensure that the proper signal/ voltage is being passed to proper components. Isolation checks help the installation crew to know whether they installed the equipment correctly (*e.g.*, no lines were improperly severed, prevention of connector miswiring, no hanging wires that can come lose, providing the U.S. government with a safe-to-fly aircraft, etc.).

18.     In fact, as Ed indicated to both Elbit Systems initially and later the U.S. government investigators, Elbit Systems and M7 had issues during the early stages of the DOD project due to wires in a connector not being installed and tested properly, which caused a gun turret to operate uncontrollably and wildly after installation. Ed understood and relayed that these types of safety failures could cause serious and potentially fatal harm to the ground crews and to the soldiers in the field.

19.     Furthermore, Mr. Rojas brought attention to a number of actions by Elbit Systems and M7 that violated the Technical Directive given by the Department of Defense, including asking

for the Marines to remove all panels and avionics components, which M7 and Elbit were on contract to do and were, in fact, paid to do. This maneuver saved M7 and Elbit time and allowed them to pocket the cost.

20.     Moreover, Ed brought to the investigators' attentions that the M7 team in New River was shimming the installed brackets, which directly affected the aircraft's ability to pass mapping procedures. In addition to being against the specification, M7's shimming of the brackets was a direct violation of the DOD Technical Directive and constituted the placement of an unapproved, foreign object into the aircraft, which can come loose during flight and cause injury to the aircraft and personnel.

21.     On October 21, 2014, following an investigation of the matter, a JAG officer from the U.S. Navy determined that (i) the safety concerns reported by Messrs. Trevino and Rojas were valid, and (ii) the DOD project was in violation of safety regulations, *inter alia*. Accordingly, the contract for the DOD project was revoked from Elbit Systems and M7, and they were required to rebid for the contract.

### E. WHISTLEBLOWER RETALIATION

22.     On October 29, 2014, Elbit Systems removed all programs from Mr. Rojas' workload. Mr. Rojas was, instead, forced to sit substantially idle at his desk with menial and sporadic work for several months. During this time, Ed was instructed to charge his time as "DID4," which was a code for "Idle/Down Time," even though there were many programs that needed additional personnel and Ed was an expert with the mapping tool called the FACT Tool, which, again, other programs needed qualified personnel to operate. Whenever Ed made requests to work on these other programs, he was immediately denied and told that he could not work on them.

23.     Before his termination, Ed was instructed by his direct supervisor Andy Taylor to look at old bids for contracts and "prove" that Ed knew what it meant to be a Systems Engineer. During this time, Mr. Taylor also sent Ed an unapproved tailoring matrix to fill out, which is used to tailor program events and activities to the specific needs of the program, such as Preliminary Design Reviews and Functional Configuration Audits. Ed was the only Systems Engineer to receive this lower-level task, and he was, again, instructed to bill the degrading work as "DID4" while the other Systems Engineers continued to work as normal.

24.     On January 9, 2015, Mr. Taylor instructed Ed to charge a base pass renewal to the DOD project; however, Ed was removed from that program months before and had not supported such program since his removal. When Ed brought this to Mr. Taylor's attention and indicated that it would be a mischarging of time and violation of the law, Mr. Taylor forced him to charge the program anyway.

25.     Just five days later, on January 14, 2015, Andy Taylor issued to Mr. Rojas a very poor 2014 performance review, stating that he believed Ed (i) did not have the skills to continue to be a Systems Engineer, (ii) had poor decision-making skills and job knowledge, (iii) performed unsatisfactorily on all department goals, and (iv) giving an overall impression that Ed was incompetent as an Engineer. This performance review stood in stark contrast to all of Ed's performance reviews since Elbit hired him in January 2008.

26.     On January 20, 2015, Andy Taylor directed Ed to attend an Engineering kick-off meeting, which are held when the System Engineering group requests bids. Mr. Taylor directed Ed to charge his time, again, to "DID4" and not directly to the program, even though Ed was writing and providing Bases of Estimates on that specific program. This was a mischarging violation, and I Ed again protested that point. On January 26, 2015, Mr. Taylor directed Ed to

provide Bases of Estimates to him by the end of the day and to ensure he did not correctly charge his time to the proper program, which was a mischarging violation, and could cause Elbit to incur fines and penalties from the U.S. government.

27.     On January 27, 2015, Ed signed his 2014 performance review under protest. In his response, Ed listed numerous violations that he felt were committed by management and Mr. Taylor, specifically, such as using FMLA against Ed in his performance review, which Ed stated was retaliatory in nature, and stating in the performance review that there were positions available for Ed to work on but was barred from.

28.     During a system engineering staff meeting on February 18, 2015, Ed was made aware of a program that was in need of a Technical Lead to support Link 11/22 work. Because he was specifically hired for his data links experience in 2008, Mr. Rojas asked if he could be placed on that program, but Mr. Taylor, again, refused.

29.     On March 2, 2015, Mr. Rojas was retrieved from his desk by Pierre Drolette and escorted to human resources. Elbit Systems terminated Ed's employment as a Senior Systems Engineer that day, stating that his termination was part of a "reduction in force." Importantly, however, Ed Rojas was the only Systems Engineer to be terminated during this "reduction in force."

**F.   TERMINATION OF EMPLOYMENT AND PERSONAL FALLOUT**

30.     By the time of Mr. Rojas' termination by Elbit Systems, he had begun to experience intense anxiety over the possibility of losing his job and not being able to provide for his family, including an autistic son. However, when he was terminated on March 2, 2015, Ed's anxiety turned into depression, and he became constantly afraid for the future.

31.     Following his termination, Ed attempted to gain new employment and applied for many jobs, but with his wife in school and his daughter in her senior year of high school, finances were

strained and they were forced to dip into their college funds. Instead of proudly sending his daughter to attend Texas Tech University, Ed and his wife could only afford to pay for her education at a local community college, as the funds that were previously allocated to her college fund were necessary to support the family's daily living. When it became apparent that he would lose his unemployment benefits, Mr. Rojas took a job at Chik-fil-a on October 12, 2015. As Mr. Rojas' anxiety and depression languished on with financials strains, Ed's relationship with his wife deteriorated and suffered immensely, culminating in a divorce after 20 years of marriage.

## IV.
### EXHAUSTION OF ADMINISTRATIVE AND STATUTORY REMEDIES

32.  Pursuant to 10 U.S.C. § 2409(b), *et seq*., Plaintiff Eduardo Rojas timely filed a Complaint of retaliation with the Department of Defense, Office of the Inspector General on March 12, 2017, and more than 180 days have passed since the filing of such Complaint, and no order has been issued in that regard. As such, Plaintiff Eduardo Rojas now brings this action *de novo*, pursuant to 10 U.S.C. § 2409(c)(2).

## V.
### CAUSES OF ACTION

33.  The foregoing paragraphs are realleged and incorporated by reference herein.

### A. 10 U.S.C. § 2409 – WHISTLEBLOWER REPRISAL

34.  Defendant Elbit Systems subjected Plaintiff Eduardo Rojas to adverse employment actions in retaliation for his report of and participation in the reporting of information protected under 10 U.S.C. § 2409; namely, reporting and provision of supporting evidence to (a) Elbit Systems in-house counsel, (b) the U.S. government program manager, and (c) the Department of Defense, Office of the Inspector General regarding gross mismanagement of a Department of Defense contract granted to Elbit Systems and M7, a gross waste of DOD funds, and violations

of law, rule, or regulation related to a Department of Defense contract or grant awarded to Elbit Systems and its subsidiary M7.

35.     Specifically, Mr. Rojas was retaliated against for reporting concerns and issues with compliance with DOD safety regulations, the DOD Technical Directive, and waste, fraud, and abuse of contract funds related to Elbit Systems' and M7's failures to perform, *inter alia*, vital and necessary systems checks, including Pitot-Static and isolation checks, as described herein. Mr. Rojas reported the herein-described compliance issues and concerns to Elbit Systems' in-house counsel on September 26, 2015, and September 29, 2015. Furthermore, Mr. Rojas reported the herein-described compliance issues and concerns to Elbit Systems' in-house counsel and the U.S. government program manager on October 9, 2015. Following his meeting with and reporting to the U.S. government program manager, Mr. Rojas participated in and contributed substantial evidence toward the investigation initiated in conjunction with Mr. Trevino at the Judge Advocate General's Corp and the Department of Defense, Office of the Inspector General on October 9, 2015.

36.     In a first act of retaliation, Elbit Systems removed all programs from Mr. Rojas' workload on October 29, 2015, a mere eight days following a U.S. Navy JAG officer's determination that Messrs. Rojas and Trevino's complaints were valid and the underlying contract was pulled from Elbit Systems and M7.

37.     After pulling all programs from Mr. Rojas on October 29, 2015, Mr. Rojas' managers from Elbit Systems, including Andy Taylor and Pierre Drolette, forced him to, instead, sit substantially idle at his desk for several months with menial and sporadic work. Between October 29, 2015, and the date of his retaliatory termination, Mr. Rojas made several attempts to offer his expertise and services on programs that needed staff of his exact qualifications and

experience, but each time he was rebuffed and told that he would not be assigned to the programs.

38.     On January 9, 2015, Mr. Rojas was instructed to charge a base pass renewal to a program from which he had been pulled and not performed work on for several months. Mr. Rojas indicated to Andy Taylor that this would be a violation of the law and regulation, but Mr. Taylor persisted with his demand that Mr. Rojas charge the base pass renewal to the DOD project account. On January 14, 2015, just five days later, Mr. Taylor issued Mr. Rojas a very poor and retaliatory 2014 performance review, which Mr. Rojas signed under protest on January 27, 2015, including a list of complaints regarding mismanagement.

39.     Ultimately, Elbit Systems retaliated against Mr. Rojas by terminating his employment on March 2, 2015, citing a "reduction in force." This stated reason for termination was a mere pretext for retaliation, as Mr. Rojas was the only engineer terminated during the "reduction in force." Defendant Elbit Systems thus committed unlawful employment practices in violation of 10 U.S.C. § 2409, *et seq*.

40.     Because of Elbit Systems' retaliatory employment practices, including, but not limited to, the termination of Mr. Rojas' employment and removal of all programs from his workload, Mr. Rojas is entitled to recover compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, with interest thereon, pursuant to 10 U.S.C. § 2409(c), *et seq*.

41.     Mr. Rojas sustained lost wages and employment benefits by reason of Elbit Systems' commission of such unlawful employment practices. Accordingly, Mr. Rojas is entitled to an award of back pay with prejudgment interest in accordance with 10 U.S.C. § 2409(c).

42.    Because Elbit Systems engaged in unlawful employment practices with malice or with reckless indifference to Mr. Rojas' federally protected rights, as plainly exemplified by the immediate removal of his programs following an investigation by the U.S. Navy JAG which found Mr. Rojas' complaints to be legitimate and valid, Mr. Rojas is entitled to an award of exemplary damages, pursuant to 10 U.S.C. § 2409(c)(4).

43.    Mr. Rojas is entitled to recover attorney and expert fees and costs in accordance with 10 U.S.C. § 2409(c), *et seq*.

### B.  31 U.S.C. § 3730(H) – FALSE CLAIMS ACT

44.    In addition, Plaintiff Eduardo Rojas brings a cause of action under the False Claims Act 31 U.S.C. § 3730(h) against Elbit Systems for taking retaliatory employment actions against Mr. Rojas in

45.    Defendant Elbit Systems subjected Plaintiff Eduardo Rojas to adverse employment actions in retaliation for his report of and participation in the reporting of information protected under the False Claims Act 31 U.S.C. § 3730(h); namely, reporting and provision of supporting evidence to (a) Elbit Systems in-house counsel, (b) the U.S. government program manager, (c) the Department of Defense, Office of the Inspector General, and (d) his managers, including Andy Taylor, regarding gross mismanagement of a Department of Defense contract granted to Elbit Systems and M7, a gross waste of DOD funds, and violations of law, rule, or regulation related to a Department of Defense contract or grant awarded to Elbit Systems and its subsidiary M7.

46.    To wit, Mr. Rojas was retaliated against for reporting concerns and issues with compliance with DOD safety regulations, the DOD Technical Directive, and waste, fraud, and abuse of contract funds related to Elbit Systems' and M7's failures to perform, *inter alia*, vital

and necessary systems checks, including Pitot-Static and isolation checks, as described herein. Mr. Rojas reported the herein-described compliance issues and concerns to Elbit Systems' in-house counsel on September 26, 2015, and September 29, 2015. Furthermore, Mr. Rojas reported the herein-described compliance issues and concerns to Elbit Systems' in-house counsel and the U.S. government program manager on October 9, 2015. Following his meeting with and reporting to the U.S. government program manager, Mr. Rojas participated in and contributed substantial evidence toward the investigation initiated in conjunction with Mr. Trevino at the Judge Advocate General's Corp and the Department of Defense, Office of the Inspector General on October 9, 2015.

47.     In a first act of retaliation, Elbit Systems removed all programs from Mr. Rojas' workload on October 29, 2015, a mere eight days following a U.S. Navy JAG officer's determination that Messrs. Rojas and Trevino's complaints were valid and the underlying contract was pulled from Elbit Systems and M7.

48.     After pulling all programs from Mr. Rojas on October 29, 2015, Mr. Rojas' managers from Elbit Systems, including Andy Taylor and Pierre Drolette, forced him to, instead, sit substantially idle at his desk for several months with menial and sporadic work. Between October 29, 2015, and the date of his retaliatory termination, Mr. Rojas made several attempts to offer his expertise and services on programs that needed staff of his exact qualifications and experience, but each time he was rebuffed and told that he would not be assigned to the programs.

49.     On January 9, 2015, Mr. Rojas was instructed to charge a base pass renewal to a program from which he had been pulled and not performed work on for several months. Mr. Rojas indicated to Andy Taylor that this would be a violation of the law and regulation, but Mr. Taylor

persisted with his demand that Mr. Rojas charge the base pass renewal to the DOD project account. On January 14, 2015, just five days later, Mr. Taylor issued Mr. Rojas a very poor and retaliatory 2014 performance review, which Mr. Rojas signed under protest on January 27, 2015, including a list of complaints regarding mismanagement.

50.     Ultimately, Elbit Systems retaliated against Mr. Rojas by terminating his employment on March 2, 2015, citing a "reduction in force." This stated reason for termination was a mere pretext for retaliation, as Mr. Rojas was the only engineer terminated during the "reduction in force." Defendant Elbit Systems thus committed unlawful employment practices in violation of 31 U.S.C. § 3730(h).

51.     Because of Elbit Systems' retaliatory employment practices, including, but not limited to, the termination of Mr. Rojas' employment and removal of all programs from his workload, Mr. Rojas is entitled to recover two times the amount of back pay, with compound interest applied prior to the doubling thereof, compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, with interest thereon, pursuant to 31 U.S.C. § 3730(h)(2).

52.     Furthermore, Mr. Rojas is entitled to recover all costs of this litigation and reasonable attorney's fees in accordance with 31 U.S.C. § 3730(h)(2).

## VI.
### DEMAND FOR TRIAL BY JURY

53.     Plaintiff hereby demands a jury trial in accordance with federal law. The jury fee has been tendered.

# VII.
## CONCLUSION AND PRAYER

WHEREFORE, FOR THE REASONS STATED, Plaintiff Eduardo Rojas prays that Defendant Elbit Systems be cited to appear and answer herein, and that on final trial Mr. Rojas have judgment for the following relief:

i.   Back pay, front pay, and other equitable relief in lieu of reinstatement for violation of 10 U.S.C. § 2409;

ii.  Two times back pay in lieu of reinstatement, with compound interest applied before the doubling thereof, for violation of 31 U.S.C. § 3730(h)(2);

iii. Compensatory damages;

iv.  Exemplary damages;

v.   Pre-judgment and post-judgment interest at the rates provided by law;

vi.  All costs of litigation;

vii. Attorney and expert fees and all court costs; and

viii. Such other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted.

/s/Susan E. Hutchison
SUSAN E. HUTCHISON
Texas Bar No. 10354100
hutch@hsjustice.com
J. ROBERT HUDSON, JR.
Texas Bar No. 24094736
jr@hsjustice.com

HUTCHISON & STOY, PLLC
505 Pecan St., Ste. 101
Fort Worth, Texas 76102
T: (817) 820-0100
F: (817) 820-0111

**ATTORNEYS FOR PLAINTIFF**